# 2024-1015

In The

# United States Court Of Appeals
# For The Federal Circuit

**In re: JAROM MCDONALD, THERON BRENT HARMON, JEFFREY HARMON, NEAL HARMON, VIDANGEL, INC., ANGEL STUDIOS, INC.,**

***Appellants.***

**ON APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**ORIGINATING CASE NO.: PTO-1 : 15/454,677**

## BRIEF OF APPELLANTS

**Joseph M. Shapiro**
**SHAPIRO IP LAW**
**138 E 12300 S**
**Unit 334**
**Draper, UT 84020**
**(801) 921-1136**

***Counsel for Appellants***

*Gibson*MOORE APPELLATE SERVICES, LLC ♦ 206 East Cary Street ♦
P.O. Box 1460 (23218) Richmond, VA 23219 ♦
804-249-7770 ♦ www.gibsonmoore.net

CLAIMS

21. A computer-implemented method, comprising:

providing media content to a consumer computer device;

presenting a tipping interface, related to the media content, to the consumer computer device; and

receiving tipping input from the consumer computer device, through the tipping interface, wherein the tipping input includes information associated with a tip;

wherein:

the tipping interface is a computer-based interface; and

the media content includes closing credits and the tipping interface is presented at the beginning of or during the closing credits; or

the tipping interface is presented at one or more trigger points during the media content.

22. The method of claim 21, wherein the media content includes closing credits and the tipping interface is presented at the beginning of or during the closing credits.

23. The method of claim 21, wherein the tipping interface is presented at one or more trigger points during the media content.

24. A computer-implemented method, comprising:

providing media content to a consumer computer device;

presenting a tipping interface, related to the media content, to the consumer computer device; and

receiving tipping input from the consumer computer device, through the tipping interface, wherein the tipping input includes information associated with a tip; and

wherein:

the tipping interface is a computer-based interface; and

the tipping interface includes elicitation content;

the tipping interface includes an upsell interface; or

the tipping interface includes an indication that a tip will be used for at least one of the following: financing a sequel for the media content, improving streaming for the media content, improving filtering for the media content, improving distribution of the media content, and improving affordability of the media content.

25. The method of claim 24, wherein the tipping interface includes elicitation content.

26. The method of clam 25, wherein the elicitation content comprises a message from an actor, producer, director, or developer of the media content.

27. The method of claim 24, wherein the tipping interface includes an upsell interface.

28. The method of claim 24, wherein the tipping interface includes an indication that a tip will be used for at least one of the following: financing a sequel for the media content, improving streaming for the media content, improving filtering for the media content, improving distribution of the media content, and improving affordability of the media content.

29. A computer-implemented method, comprising:

providing media content to a consumer computer device;

presenting a tipping interface, related to the media content, to the consumer computer device; and

receiving tipping input from the consumer computer device, through the tipping interface, wherein the tipping input includes information associated with a tip; and

wherein:

the tipping interface is a computer-based interface; and

the tipping interface includes tipping estimate information and the tipping estimate information is based at least in part on at least one item from the following list:

tipping data for another consumer of the media content; and

tipping data for another consumer that shares at least one common characteristic with the consumer; or

presenting the tipping interface comprises determining characteristics of the tipping interface based on historical tipping results.

30. The method of claim 29, wherein the tipping interface includes tipping estimate information and the tipping estimate information is based at least in part on tipping data for another consumer of the media content.

31. The method of claim 29, wherein the tipping interface includes tipping estimate information and the tipping estimate information is based at least in part on tipping data for another consumer that shares at least one common characteristic with the consumer.

32. The method of claim 29, wherein presenting the tipping interface comprises determining characteristics of the tipping interface based on historical tipping results.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1015

**Short Case Caption** In re: McDonald

**Filing Party/Entity** All Appellants (VidAngel, Inc.; Angel Studios, Inc.; Jarom McDonald; Theron Harmon; Jeffrey Harmon; Neal Harmon)

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/19/2023

Signature: /Joseph Shapiro/

Name: Joseph Shapiro

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| VidAngel, Inc. | | |
| Angel Studios, Inc. | | |
| Jarom McDonald | | |
| Theron Harmon | | |
| Jeffrey Harmon | | |
| Neal Harmon | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page:**


TABLE OF AUTHORITIES .................... ii

STATEMENT OF RELATED CASES .................... iv

INTRODUCTION .................... 1

STATEMENT OF JURISDICTION .................... 1

STATEMENT OF ISSUES .................... 2

STATEMENT OF THE CASE .................... 2

SUMMARY OF THE ARGUMENT .................... 4

ARGUMENT .................... 5

I. Standard of Review .................... 5

II. Claims 21, 24, and 29 recite eligible subject matter .................... 5

III. Claim 21 is nonobvious under § 103 .................... 11

IV. Claim 24 is nonobvious under § 103 .................... 14

V. Claim 26 is nonobvious under § 103 .................... 19

VI. Claim 28 is nonobvious under § 103 .................... 20

VII. Claim 29 is nonobvious under § 103 .................... 20

VIII. The dependent claims are nonobvious under § 103 .................... 21

CONCLUSION .................... 21

ADDENDUM

CERTIFICATE OF SERVICE AND FILING

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .......... 5, 6, 8, 10

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......... 10-11

*Bilski v. Kappos*,
561 U.S. 593 (2010) .......... 6

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*,
955 F.3d 971 (Fed. Cir. 2020) .......... 6

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013) .......... 17

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) .......... 7

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) .......... 6

*Coop. Ent., Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) .......... 5, 6

*Corephotonics, Ltd. v. Apple Inc.*,
84 F.4th 990 (Fed. Cir. 2023) .......... 5

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017) .......... 7

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
81 F.4th 1368 (Fed. Cir. 2023) .......... 17

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
8 F.4th 1331 (Fed. Cir. 2021) .......... 17

*In re Graves*,
69 F.3d 1147 (Fed. Cir. 1995) .......... 17

*In re Merck & Co., Inc.*,
800 F.2d 1091 (Fed. Cir. 1986) .......... 12

*Intell. Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) .......... 7

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......... 12

*NetSoc, LLC v. Match Grp., LLC*,
838 F. App'x 544 (Fed. Cir. 2020) .......... 7

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
412 F.3d 1284 (Fed. Cir. 2005) .......... 16

*Roku, Inc. v. Universal Elecs., Inc.*,
63 F.4th 1319 (Fed. Cir. 2023) .......... 5

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
329 F.3d 823 (Fed. Cir. 2003) .......... 16

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
17 F.4th 155 (Fed. Cir. 2021) .......... 14, 17

*W.E. Hall Co. v. Atlanta Corrugating, LLC*,
370 F.3d 1343 (Fed. Cir. 2004) .......... 16

*Weisner v. Google LLC*,
51 F.4th 1073 (Fed. Cir. 2022) .......... 7

*Young Dental Mfg. Co. v. Q3 Special Prod., Inc.*,
112 F.3d 1137 (Fed. Cir. 1997) .......... 16

**Statutes:**

28 U.S.C. § 1295(a)(4)(A) .......... 1

35 U.S.C. § 101 .......... *passim*

35 U.S.C. § 103 .......... *passim*

## STATEMENT OF RELATED CASES

There have been no other appeals in this case. Aside from this case, there are no other cases known to counsel to be pending in this or in any other court that will directly affect or be directly affected by this Court's decision in this appeal.

# INTRODUCTION

Appellants' claims on appeal are directed to novel methods for integrating tipping interfaces with consumption of [often] streamed digital content. The PTAB affirmed the Examiner's rejection under § 101 that the appealed claims are directed to an abstract idea and therefore comprise ineligible subject matter. The PTAB additionally affirmed the Examiner's rejections of the appealed claims as obvious under § 103 based on various combinations of several prior art references.

The PTAB's rejection under § 101 is legally incorrect because it misapplies the law of subject matter eligibility. The appealed claims are not directed to the abstract idea of tipping but are instead directed to a novel use of technology to present an innovative interface for eliciting and receiving tips in conjunction with consumption of streamed media content. The PTAB's rejections under § 103 are factually and legally incorrect because the cited prior art references do not disclose all elements of the appealed claims and additionally because the PTAB has failed to find the required rationale for combining prior art references as required under the law of obviousness.

# STATEMENT OF JURISDICTION

This is an appeal from a final decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office with respect to U.S. Application No. 15/454,677. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUES

**I. Whether the Board's decision should be reversed for incorrectly applying the law of subject matter eligibility under § 101**

**II. Whether the Board's decision should be reversed for incorrectly applying the law of obviousness under § 103**

## STATEMENT OF THE CASE

One of the significant difficulties for content owners and producers in the age of content streaming has been monetizing content. Prior to streaming, content was often monetized on a pay-to-consume model: pay for cable to consume cable tv, buy a CD or DVD to consume the associated content, buy a ticket to see a movie. This model has spilled over to some extent into the streaming age, e.g., purchasing a subscription to access streaming content. The principal streaming monetization paradigm for streamed content is advertising, e.g., on YouTube: a consumer watches content for free but must also watch commercials or other advertising in conjunction with the content. One problem with these paradigms is that potential consumers may not be willing to pay, or may limit what they are willing to pay, until they have consumed some or all of the content.

The invention of pending application no. 15/454,677 ("'677 Application") is an integration of content streaming with a well-designed interface for eliciting and receiving tips to facilitate tipping for media content and to also present the tipping

interface in a manner and at times that are most likely to result in a content consumer making a tip and/or making a larger tip.

The USPTO Examiner rejected the appealed claims under § 101 as ineligible subject matter. Although tipping is, in general, a long-standing economic practice, the appealed claims are not directed to the abstract idea of tipping or of merely implementing tipping on a computer, but are instead directed to the idea of integrating technology with presentation of streamed content to elicit and facilitate voluntary tipping from consumers of streamed content.

The USPTO Examiner additionally rejected the appealed claims as obvious under § 103 in light of several prior art references: Carlson (US US20100325048A1), Appx358-381; Ignacio (US20140337099A1), Appx382-393; Lim (US20180374121A1), Appx394-442; Mowry (US20170109699A1), Appx443-462; Twist (US20180158114A1), Appx463-498; Van Vleck (US20090158369A1), Appx499-513. Although some of the claimed elements are disclosed in the prior art references, the Examiner incorrectly concluded that combination of the prior art references was per se obvious because such combination resulted in an improvement to the state of the art in providing streaming content to consumers.

Appellants appealed the Examiner's rejections to the PTAB, which affirmed the Examiner's rejections and reasoning for both the § 101 and the § 103 rejections. Appellants appealed the PTAB's decision to this Court.

## SUMMARY OF THE ARGUMENT

The PTAB misapplies the law of subject matter eligibility, failing to acknowledge that the appealed claims are not directed to the abstract idea of tipping or even an electronic/computer interface for general tipping, but are instead directed to integration of the presentation of streamed media content with technology for presenting an associated tipping interface. The appealed claims are therefore not directed to an abstract idea, and are additionally a practical application of technologies and innovations relating to streaming, monetization, and garnering tips in conjunction with media streaming.

Regarding the § 103 obviousness rejections, the PTAB incorrectly applies obviousness law for combining prior art references. The PTAB incorrectly concludes that any improvement resulting from combining two references makes the combination obvious. But this is not the case. The references must be analogous and the resulting improvement from combination must be a *predictable* improvement having a reasonable expectation of success.

## ARGUMENT

### I. Standard of Review

"Patent eligibility is ultimately a question of law [the Federal Circuit] review[s] de novo. Eligibility, however, may depend on underlying issues of fact." *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022).

"The ultimate question of obviousness is a legal question that [the Federal Circuit] review[s] de novo with underlying factual findings that [the Federal Circuit] review[s] for substantial evidence." *Roku, Inc. v. Universal Elecs., Inc.*, 63 F.4th 1319, 1324 (Fed. Cir. 2023). "Among those issues of fact is what the prior art discloses to an ordinarily skilled artisan. What the prior art discloses and whether a person of ordinary skill would have been motivated to combine prior-art references are both fact questions that [the Federal Circuit] review[s] for substantial evidence." *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1003 (Fed. Cir. 2023) (citations and internal quotation marks omitted).

### II. Claims 21, 24, and 29 recite eligible subject matter.

Claims 21, 24, and 29 are directed to patentable subject matter under § 101; these claims are not directed to a judicial exception and even if they were they reflect inventive concepts that transform the claims into a practical application of the abstract idea under the *Alice/Mayo* analysis. Appx31-34.

This Court has summarized the *Alice/Mayo* framework on numerous occasions:

> To determine patent eligibility, we apply the Supreme Court's two-step *Alice* framework. At step one, we determine whether the claim is "directed to" a "patent-ineligible concept," such as an abstract idea. If it is, at step two we examine "the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." Specifically, we determine whether the claim elements, individually and as an ordered combination, contain an inventive concept, which is more than merely implementing an abstract idea using "well-understood, routine, [and] conventional activities previously known to the industry." Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014) (quoting Alice, 573 U.S. at 225, 134 S.Ct. 2347) (alteration in original).

*Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022) (citing and quoting *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014)).

Some methods of "organizing human activity," e.g., "fundamental economic practices," are abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 220 (2014) (citations and internal quotation marks omitted). For example, "[f]undamental economic practices long prevalent in our system of commerce are examples of abstract ideas." *Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 978 (Fed. Cir. 2020) (citing and quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)) (internal quotation marks omitted). This Court has alternatively articulated this concept :

- "well-established methods of organizing human activity," *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018) (citation and internal quotation marks omitted);
- "longstanding commercial practices and methods of organizing human activity," *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) (citation and internal quotation marks omitted);
- "[a]utomation or digitization of a conventional method of organizing human activity," *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022) (citation omitted);
- "mere automation of manual processes using generic computers," *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017); and
- mere "automat[ion of] a longstanding, well-known method of organizing human activity," *NetSoc, LLC v. Match Grp., LLC*, 838 F. App'x 544, 550 (Fed. Cir. 2020) (citations omitted).

A common thread ties together this jurisprudence: merely implementing an old practice—something "fundamental," "long prevalent," "well-established," "longstanding," "conventional," a "manual process," or "well-known"—in technology is an ineligible abstract idea.

But claim 21 is not directed to a practice that is "fundamental," "long prevalent," "well-established," "longstanding," "conventional," "manual processes," or "well-known." Claim 21 is directed to a method for using technology to improve presentation of streamed media content to a user and for using technology to facilitate tipping in association with a user's consumption of media content.

Even if tipping is, in general, a commercial interaction that is a method of organizing human activity, claim 21 is not directed to the general idea of tipping. Claim 21 is directed to using computers to interact with a user in a manner that improves presentation of media content over a computer interface and that facilitates tipping, through a computer interface, for such media content. Claim 21 recites the idea of using the same computer interface for both presenting media content and for soliciting and facilitating tipping for the media content. The integration of media content presentation and tipping on the same computer device and interface is not merely an application of the general idea of tipping using computers, but is a novel technology for integrating media content consumption and tipping, thereby improving a viewing experience and facilitating tipping.

Under the *Alice/Mayo* patent eligibility framework, even assuming, for the sake or agument, that claim 21 recites the general idea of tipping, claim 21 integrates the general idea of tipping into a practical application by requiring that

the same computer device presents the media content and presents the tipping interface, and additionally imposing limitations on the timing of presentation of the tipping interface relative to presentation of the media content. The additional elements in claim 21 implement and use the general idea of tipping in conjunction with a computer device for presenting media content *and* interfacing with a user regarding tipping. Claim 21 includes meaningful limits so that the claim is much more than a drafting effort designed to monopolize the abstract idea of tipping.

Claims 24 and 29 are patent-eligible for the same reasons as claim 21. The only differences between claims 21, 24, and 29 are the "additional elements":

| |
|---|
| Claim 21 "Additional Elements":<br><br>wherein:<br><br>the media content includes closing credits and the tipping interface is presented at the beginning of or during the closing credits; or<br><br>the tipping interface is presented at one or more trigger points during the media content. |
| Claim 24 "Additional Elements":<br><br>wherein:<br><br>the tipping interface includes elicitation content;<br><br>the tipping interface includes an upsell interface; or |

| |
|---|
| the tipping interface includes an indication that a tip will be used for at least one of the following: financing a sequel for the media content, improving streaming for the media content, improving filtering for the media content, improving distribution of the media content, and improving affordability of the media content. |
| Claim 29 "Additional Elements":<br><br>wherein:<br><br>the tipping interface includes tipping estimate information and the tipping estimate information is based at least in part on at least one item from the following list:<br><br>tipping data for another consumer of the media content; and<br><br>tipping data for another consumer that shares at least one common characteristic with the consumer; or<br><br>presenting the tipping interface comprises determining characteristics of the tipping interface based on historical tipping results. |

For purposes of § 101 subject-matter-eligibility analysis, the additional elements in claims 21, 24, and 29 serve the same purpose: they (i) narrow the claim so that the claim is not directed to an abstract idea and (ii) are part of a practical application under Step 2 of the *Alice/Mayo* framework. *Bascom Glob. Internet Servs., Inc. v.*

*AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016) (finding subject matter eligibility where "an inventive concept can be found in the ordered combination of claim limitations that transform the abstract idea . . . into a particular, practical application of that abstract idea").

**III. Claim 21 is nonobvious under § 103.**

Claim 21 is not obvious under Lim and Van Vleck because it would not have been obvious to combine Van Vleck's disclosure of tipping timing with Lim's disclosure of a tipping interface to make obvious a tipping interface "presented at the beginning of or during the closing credits" or a tipping interface "presented at one or more trigger points during the media content" as required in claim 21. Lim discloses a tipping interface for text/non-video content such as a news article, but does not disclose a tipping interface presented *at the beginning of or during the closing credits* or *at one or more trigger points during the media content*." Appx416, Appx439-440. Van Vleck discloses an interface, presented between two segments of media content, for purchasing content, purchasing merchandise, or for selecting additional content for viewing. But Van Vleck does not disclose an interface for *tipping*.

It would not have been obvious to combine Van Vleck's disclosure of a media-content-related interface with Lim's disclosure regarding tipping for static content. The Examiner provides no justification for combining, instead concluding,

"Therefore it would have been prima facie obvious to one of ordinary skill in the art . . . to combine the teachings of Lim and Van Vleck to provide an improved system and method for displaying media content and an interactive display."

The PTAB approves of the Examiner's conclusory argument that an improvement is per se obvious and adds that "Van Vleck only adds timing parameters to Lim, which are predictably successful on their face." [Appx20]. But it would not have made sense to apply "timing parameters" to Lim's disclosure of static content. For static content, timing does not matter. Because timing does not matter for the static content disclosed in Lim, it would not have made sense to merely "add timing parameters."

"Rejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). It is insufficient to point to improvement as the reason for combining. If this rationale were permissible, every improvement would be obvious.

Also, the Examiner and the PTAB failed to make the required finding that "the results flowing from the combination would have been predictable." *In re Merck & Co., Inc.*, 800 F.2d 1091 (Fed. Cir. 1986) (obviousness combination rejection must articulate a "reasonable expectation of success"). The PTAB

employs hindsight bias to conclude that "adding timing parameters [is] predictably successful on [its] face." Appx20. But the limitations of claim 21 are not mere "timing parameters," e.g., do it at five minutes instead of two minutes, or do it for a duration of 30 seconds instead of five seconds. Instead, the limitations in claim 21 are substantive innovations that exploit human tendencies manifested in consumption of digital content on digital devices. The PTAB's analysis is akin to concluding that an improvement in the timing pattern for spark plugs on a high-end sports car is "only adding timing parameters, which are predictable on their face." The Examiner and the PTAB have both failed to articulate why success from presenting a tipping interface during closing credits or at a trigger point was predictable or reasonably expected. There simply is no reason to conclude that a person of ordinary skill in the art, as of the filing date, would have predicted that it would be useful or successful to present a tipping interface in conjunction with closing credits or at predefined trigger points. On the contrary, the conventional thought has long been that a consumer must pay for media content up front; otherwise the consumer will not pay, and it is therefore not even worth asking for payment during or after the media has been presented --- this will just annoy the consumer.

Because neither the Examiner nor the PTAB has presented or pointed to any evidence or rationale for predictable success by combining elements from Lim and

Van Vleck, they have failed to establish a prima facie case of obviousness as required. The obviousness rejection of claim 21 should therefore be overturned.

Claims 22 and 23 depend from and limit claim 21, and are therefore nonobvious for the same reasons as for claim 21.

## IV. Claim 24 is nonobvious under § 103.

Claim 24 is nonobvious under Lim, Twist, and Ignacio because these references, either individually or in combination, fail to disclose all limitations of claim 24. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021) (citation omitted).

Neither Lim nor Twist discloses that the "tipping interface includes elicitation content" as recited in claim 24. The Examiner and PTAB rely on Twist for this limitation, but Twist discloses only a naked solicitation or request to donate, and does not disclose a tipping interface that includes *elicitation* content. Although Twist discloses that the request to donate may be customizable, it does not disclose a request that includes elicitation content.

The PTAB found that "[t]he Specification does not define 'elicitation" and that "[t]he plain meaning of elicitation is the process of getting information from someone." Appx21. But the term in claims 24 and 25 is not "elicitation" but is "elicitation content"—and the Specification does address the meaning of

"elicitation content," making it clear that elicitation content is more than a mere request to tip:

- "A tipping interface . . . may include elicitation content to motivate or inspire the consumer to tip." Appx43.
- "[T]he tipping interface may include elicitation content such as an audiovisual message from an actor, producer, or another person . . . that may provide . . . elicitation related to tipping." Appx43.
- Elicitation content may include highlights from the consumed content, a video, audio, or audiovisual message from the content's creator, producer, actors, developer . . ., promoters, critics, or other interested party which may remind the consumer of the quality or highlights of the content, or additional information about the content, or other information or communication designed to encourage the consumer to leave or provide a tip . . . ." Appx48-49.
- "[E]licitation content may include a short video from a person associated with a media content service, e.g., a streaming platform or filtering solution or platform, in which the person explains the importance of reliable streaming and/or good filtering to increase availability of, customizability of, and access to content for families and others." Appx49.

- "Elicitation content 230 may be video in which a producer of the movie being played in interface element 210 discusses the movie or otherwise provides content, information, or interesting or inspiring information 235 about the movie that may incite a consumer to provide a tip . . . ." Appx49.
- The elicitation content "may include a short video from the producer of a movie . . . ." Appx50.

A claim term will generally receive its ordinary and customary meaning, but should be read in light of the specification and the drafter's clear intentions to limit or modify terms. *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289 (Fed. Cir. 2005) (citation omitted) (claim terms may be read restrictively where "patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction"); *W.E. Hall Co. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1353 (Fed. Cir. 2004) (citation omitted) (claim term may be construed different from "ordinary and customary meaning . . . where patentee has acted as his own lexicographer and clearly provided an alternate definition for the term"); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003) (citations omitted) ("proper claim construction requires an examination of the written description"); *Young Dental Mfg. Co. v. Q3 Special Prod., Inc.*, 112 F.3d 1137, 1143 (Fed. Cir. 1997) (citation omitted) ("claims are to

be read in view of the specification of which they are a part"); *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995) (citations omitted) ("proper to give claim as broad a reading as possible not inconsistent with applicant's disclosure").

It is incorrect and unnatural to treat "elicitation" as equivalent to "elicitation content." The addition of "content" makes it clear that the applicant intended for "elicitation content" to be different from naked "elicitation." Additionally, because "elicitation content" is not an everyday or common term, it is proper to rely on the Specification to understand "elicitation content."

Additionally, neither the Examiner nor the PTAB articulates any reasoning for combining Lim's disclosure about media content tipping with Twist's disclosure about using social media to seek donations for charitable causes. The Examiner and PTAB rely on the incorrect premise that *any improvement* is per se obvious. But this is not the law. The law is that a combination of analogous art from the same field may be obvious when the combination yields a *predictable improvement*. *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1375–76 (Fed. Cir. 2023) (citation omitted) (obviousness determination requires "reasonable expectation of success"); *accord, e.g.*, *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021) (citation omitted); *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021) (citation omitted); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013) (citation

and internal quotation marks omitted) ("finding of obviousness . . . requires a plausible rationale as to why the prior art references would have worked together"). Although the Examiner and PTAB have articulated an improvement, they have not articulated a *predictable* improvement or reasonable expectation of a successful outcome. Hindsight speculation about benefits or successes from combining prior art is much different from a PHOSITA's[1] reasonable expectation of success at the time a patent application was filed.

Additionally, regarding the "upsell interface" limitation (claims 24, 27), neither the Examiner nor the PTAB has articulated any reason for combining Ignacio's disclosure of rewards for higher tips for hospital service with Lim's disclosure regarding tipping for media content. The Examiner again concludes, "Therefore, it would have been prima facie obvious to combine the teachings of Lim, Twist and Ignacio to provide an improved system." But again, as explained and established above, improvement is by itself insufficient to establish obviousness. Additionally, both the Examiner and the PTAB failed to even articulate how a disclosure about gratuities for hospital service (Ignacio) is analogous art to a disclosure about tipping for media content.

[1] "Person Having Ordinary Skill in the Art"

## V. Claim 26 is nonobvious under § 103.

Claim 26 is non-obvious at least because claim 26 depends from claim 25, which is allowable, and claim 26 is therefore allowable for at least the same reasons as claim 25. Additionally, the combination of Lim, Twist, and Ignacio does not disclose elicitation content comprising "a message from an actor, producer, director, or developer of the media content" as required in claim 26. Twist discloses that a social media post may comprise a message portion, a video, and a banner with a "donate" option. Twist does not disclose an "actor, producer, director, or developer" in the video. Because Twist does not even disclose these required elements, combining with Lim and/or Ignacio is to no avail. Additionally, as already explained herein, the Examiner has failed to articulate a rationale for combining Lim, Twist, and Ignacio. Improvement does not per se establish obviousness.

The PTAB attempts to remedy this failure by reasoning that the "message" referenced in claim 26 must inherently have an actor, producer, director, or developer, and that the "message" is inherently from these individuals. But the PTAB impermissibly ignores the qualifier "of the media content," which clarifies that the "actor, producer, director, or developer" is not the individuals inherently involved in making the message, but is the actor/producer/director/developer for *the media content*—which is different from the message. Twist does not disclose a

social media post comprising a message from an actor/producer/director/developer "of the media content" that is different from the message.

## VI. Claim 28 is nonobvious under § 103.

Claim 28 is non-obvious at least because it depends from claim 24, which is non-obvious, and claim 28 is therefore non-obvious for at least the same reasons as claim 24. Additionally, the combination of Lim, Twist, Ignacio, and Mowry (US-20170109699-A1) fails to disclose that the tipping interface "includes an indication that a tip will be used for at least one of . . . financing a sequel for the media content, improving streaming for the media content, improving filtering for the media content, improving distribution of the media content, and improving affordability of the media content" as required in claim 28. The Examiner and PTAB rely on Mowry, but Mowry's disclosure is directed and limited to incentivizing individuals to support a future project, e.g., making a movie. But Mowry makes no disclosures about tipping and/or using tipping to incentivize as required in claim 28. Additionally, even if Mowry did disclose the limitation of claim 28 for tipping, the Examiner's and PTAB's rationale for combining prior art references is insufficient. Improvement does not per se establish obviousness.

## VII. Claim 29 is nonobvious under § 103.

Claim 29 is nonobvious under the combination of Lim and Carlson because the Examiner and the PTAB failed to provide a justification for combining Lim

and Carlson. It would not have been obvious to combine Carlson's disclosure of a media-content-related interface with Lim's disclosure about tipping for static content. The Examiner and PTAB provide no justification for combining, instead concluding, "Therefore it would have been prima facie obvious to one of ordinary skill in the art . . . to combine the teachings of Lim and Van Vleck to provide an improved system and method for displaying media content and an interactive display." But, again, improvement does not per se establish obviousness. Predictable improvement may establish obviousness, but the PTAB has not even paid lip service to whether the improvement was predictable.

## VIII. The dependent claims are nonobvious under § 103.

The dependent claims (22-23, 25-28, and 30-32) are nonobvious at least because the independent claims upon which these claims depend are nonobvious.

## CONCLUSION

The PTAB's decision should be reversed.

*/s/Joseph Shapiro*

Joseph Shapiro
SHAPIRO IP LAW
138 E 12300 S, Unit 334
Draper, UT 84020
jshapiro@shapiro-ip.com
801.921.1136

*Counsel for Appellants*

# ADDENDUM

# TABLE OF CONTENTS
## Addendum

**Page:**

**Decision on Appeal**
**filed July 28, 2023.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx1**

**Transmittal of New Application**
**filed March 9, 2017. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx35**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

*Ex parte* JAROM MCDONALD, THERON BRENT HARMON, JEFFREY HARMON, and NEAL HARMON

Appeal 2022-001856
Application 15/454,677
Technology Center 3600

Before ANTON W. FETTING, BRUCE T. WIEDER, and AMEE A. SHAH, *Administrative Patent Judges*.

FETTING, *Administrative Patent Judge*.

DECISION ON APPEAL

## STATEMENT OF THE CASE[1]

Jarom McDonald, Theron Brent Harmon, Jeffrey Harmon, and Neal Harmon (Appellant[2]) seek review under 35 U.S.C. § 134 of a Non-Final rejection of claims 21–32, the only claims pending in the application on appeal. We have jurisdiction over the appeal pursuant to 35 U.S.C. § 6(b).

The Appellant invented a way of eliciting, facilitating, providing, and receiving tips for media content. Specification para. 1.

An understanding of the invention can be derived from a reading of exemplary claim 21, which is reproduced below (bracketed matter and some paragraphing added).

> 21. A computer-implemented method, comprising:
>
> [1] providing media content to a consumer computer device;
>
> [2] presenting a tipping interface, related to the media content, to the consumer computer device;
>
> and
>
> [3] receiving tipping input from the consumer computer device, through the tipping interface, wherein the tipping input includes information associated with a tip;
>
> wherein:
>
> [4] the tipping interface is a computer-based interface;
>
> and

---

[1] Our decision will make reference to the Appellant's Appeal Brief ("Appeal Br.," filed August 23, 2021) and Reply Brief ("Reply Br.," filed February 7, 2022), and the Examiner's Answer ("Ans.," mailed December 6, 2021), and Non-Final Action ("Non-Final Act.," mailed March 3, 2021).

[2] We use the word "Appellant" to refer to "applicant" as defined in 37 C.F.R. § 1.42. Appellant identifies the real party in interest as VidAngel, Inc. (Appeal Br. 2).

> [5a] the media content includes closing credits and the tipping interface is presented at the beginning of or during the closing credits;
>
> or
>
> [5b] the tipping interface is presented at one or more trigger points during the media content.

The Examiner relies upon the following prior art:

| Name | Reference | Date |
|---|---|---|
| Twist | US 2018/0158114 A1 | June 7, 2018 |
| Carlson | US 2010/0325048 A1 | Dec. 23, 2010 |
| Ignacio | US 2014/0337099 A1 | Nov. 13, 2014 |
| Mowry | US 2017/0109699 A1 | Apr. 20, 2017 |
| Van Vleck | US 2009/0158369 A1 | June 18, 2009 |
| Lim | US 2018/0374121 A1 | Dec. 27, 2018 |

Claims 21–32 stand rejected under 35 U.S.C. § 101 as directed to a judicial exception without significantly more.

Claims 21–23 stand rejected under 35 U.S.C. § 103(a) as unpatentable over Lim and Van Vleck.

Claims 24–27 stand rejected under 35 U.S.C. § 103(a) as unpatentable over Lim, Twist, and Ignacio.

Claim 28 stands rejected under 35 U.S.C. § 103(a) as unpatentable over Lim, Twist, Ignacio, and Mowry.

Claims 29–32 stand rejected under 35 U.S.C. § 103(a) as unpatentable over Lim and Carlson.

## ISSUES

The issues of eligible subject matter turn primarily on whether the claims recite more than abstract conceptual advice of results desired.

The issues of obviousness turn primarily on whether the art describes the limitations and Examiner made determinations of motivation.

## FACTS PERTINENT TO THE ISSUES

*Facts Related to the Prior Art*

Lim

01. Lim is directed to allowing users of internet search engines to receive individually generated search results based on user profiles and key words. Lim para. 2.

02. Lim describes providing content providers means to receive payments for goods and services they offer either through a "pay-per-view" fee or a tipping (gratuity) scheme. For example, a content provider associated with content source 108a might offer access to a scientific journal hosted at that content source for $0.50/article (or some other pay-per-use fee). Alternatively, the content provider might provide a hyperlink to a Web site (e.g., hosted by host 104) that allows users to provide a gratuity (e.g., so as to express their appreciation for a particular story or column). Lim para. 62.

03. Lim describes a gratuity collection process allowing users to pay voluntarily, without obstructing access to the content. Payment options for such tips can be customized as open, default

suggested, check box selection, radio button selection, slide bar selection or fixed value options. This allows for great flexibility in incorporating the tip-payment feature into the content provider's web site. Lim para. 184.

04. Lim describes Web page-based tipping provides a means for voluntary payments, which can be used when a content provider wants to collect fees without erecting entry barriers for users. In such a scheme, a user views content including a tip icon, a tip form, tip link, or some other means to be directed to a payment site, etc. To then provide a tip, the user simply selects the icon, link, etc. and designates the appropriate gratuity at the site to which he/she is then directed. Lim para. 188.

Van Vleck

05. Van Vleck is directed to displaying media content and an interactive display. Van Vleck para. 1.

06. Van Vleck describes an interactive display module to display an interface that enables the subscriber to purchase recently viewed media content. Van Vleck para. 21.

07. Van Vleck describes the interactive display module determining a time to display an interactive display, such as the time to display opening credits or closing credits. For example, the first interactive display may be displayed at the start of the closing credits of a television show or movie included in the media content stream, so that the first interactive display does not interfere with viewing the media content stream. The interactive display module may display along with or instead of the media

content stream, such as with as a pop-up window that overlays the media content stream, to enable user interaction with the interactive display while the media content stream is viewed. Van Vleck para. 22.

08. Van Vleck describes the interactive display module displaying both the first interactive display and the media content stream, each in a distinct portion of the display device, such as with a first window displaying the first interactive display and a second window displaying the media content stream. The two windows may be the same size or different sizes. Van Vleck para. 23.

Twist

09. Twist is directed to customizing an electronic communication within a social networking system to include an option to contribute to a charitable cause. In particular, the option to contribute is a user-selectable element provided in tandem with the electronic communication. Twist para. 5.

10. Twist describes identifying content within the communication that indicates to the recipient a desire to solicit contributions to a charitable organization. Twist para. 20.

Ignacio

11. Ignacio is directed to facilitating delivery of customer-specified service in a hospitality setting. Ignacio para. 2.

12. Ignacio describes presenting a customer with rewards (e.g., points) for specifying a generous gratuity level (e.g., 22%) in order to encourage customer to compensate hospitality worker well. Ignacio para. 48.

Mowry

13. Mowry is directed to funding entertainment projects. Mowry para. 2.
14. Mowry describes incentives that at least partly involve subsequent or additional media being provided to the user after an initial or related network-based interaction occurs between the user and a site and/or other user. Mowry para. 19.

Carlson

15. Carlson is directed to providing a consumer with an alert regarding a payment transaction, and more specifically, to a system and method for providing a consumer with an alert or message that can be used to determine a suitable tip or gratuity for the transaction. Carlson para. 2.

## ANALYSIS

*Claims 21–32 rejected under 35 U.S.C. § 101 as directed to a judicial exception without significantly more*

STEP 1[3]

Claim 21, as a method claim, nominally recites one of the enumerated categories of eligible subject matter in 35 U.S.C. § 101. The issue before us is whether it is directed to a judicial exception without significantly more.

[3] For continuity of analysis, we adopt the steps nomenclature from 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (Jan. 7, 2019) ("Revised Guidance").

STEP 2

> The Supreme Court
>
> set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. First, . . . determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us? To answer that question, . . . consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. [The Court] described step two of this analysis as a search for an "'inventive concept'"—i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014) (citations omitted) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012)). To perform this test, we must first determine what the claims are directed to. This begins by determining whether the claims recite one of the judicial exceptions (a law of nature, a natural phenomenon, or an abstract idea). Then, if the claims recite a judicial exception, determining whether the claims at issue are directed to the recited judicial exception, or whether the recited judicial exception is integrated into a practical application of that exception, i.e., that the claims "apply, rely on, or use the judicial exception in a manner that imposes a meaningful limit on the judicial exception, such that the claim is more than a drafting effort designed to monopolize the judicial exception." Revised Guidance, 84 Fed. Reg. at 54. If the claims are directed to a judicial exception, then finally determining whether the claims provide an inventive concept because the

additional elements recited in the claims provide significantly more than the recited judicial exception.

STEP 2A Prong 1

At a high level, and for our preliminary analysis, we note that method claim 21 recites providing media data, presenting computer based interface data, and receiving input data. Providing data is transmitting data. Presenting data is displaying data. Thus, claim 21 recites transmitting, displaying, and receiving data. None of the limitations recites technological implementation details for any of these steps, but instead recite only results desired by any and all possible means.

From this we see that claim 21 does not recite the judicial exceptions of either natural phenomena or laws of nature.

Under Supreme Court precedent, claims directed purely to an abstract idea are patent ineligible. As set forth in the Revised Guidance, which extracts and synthesizes key concepts identified by the courts, abstract ideas include (1) mathematical concepts[4], (2) certain methods of organizing

[4] *See, e.g.*, *Gottschalk v. Benson*, 409 U.S. 63, 71–72 (1972); *Bilski v. Kappos*, 561 U.S. 593, 611 (2010); *Mackay Radio & Telegraph Co. v. Radio Corp. of Am.*, 306 U.S. 86, 94 (1939); *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018).

human activity[5], and (3) mental processes[6]. Among those certain methods of organizing human activity listed in the Revised Guidance are commercial or legal interactions. Like those concepts, claim 21 recites the concept of managing commercial tipping payments. Specifically, claim 21 recites operations that would ordinarily take place in advising one to present a way for a media content consumer to make a tip payment. The advice to present a way for a media content consumer to make a tip payment involves tipping, which is an economic act, and presenting a way to accept a tip, which is an act ordinarily performed in the stream of commerce. For example, claim 21 recites "receiving tipping input," which is an activity that would take place whenever one is tipping. Similarly, claim 21 recites "tipping interface is presented," which is also characteristic of tipping.

The Examiner determines the claims to be directed to the completion of a financial transaction. Non-Final Act. 2. The preamble to claim 21 does not recite what it is to achieve, but the steps in claim 21 result in managing commercial tipping payments by presenting a way for a media content consumer to make a tip payment absent any technological mechanism other than a conventional computer for doing so.

As to the specific limitations, limitation 3 recites receiving data. Limitations 1, 2, 4, and 5 recite generic and conventional transmitting,

---

[5] *See, e.g.*, *Bilski*, 561 U.S. at 628; *Alice*, 573 U.S. at 219–20; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014); *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1383 (Fed. Cir. 2017); *In re Marco Guldenaar Holding B.V.*, 911 F.3d 1157, 1160–61 (Fed. Cir. 2018).
[6] *See, e.g.*, *Benson*, 409 U.S. at 67; *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371–72 (Fed. Cir. 2011); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016).

displaying, and receiving of tipping data, which advise one to apply generic functions to get to these results. The limitations thus recite advice for presenting a way for a media content consumer to make a tip payment. To advocate presenting a way for a media content consumer to make a tip payment is conceptual advice for results desired and not technological operations.

The Specification at paragraph 1 describes the invention as relating to eliciting, facilitating, providing, and receiving tips for media content. Thus, all this intrinsic evidence shows that claim 21 recites managing commercial tipping payments. This is consistent with the Examiner's determination.

This in turn is an example of commercial or legal interactions as a certain method of organizing human activity because managing commercial tipping payments is a commercial interaction. The concept of managing commercial tipping payments by presenting a way for a media content consumer to make a tip payment is one idea for collecting tips. The steps recited in claim 21 are part of how this might conceptually be premised.

Our reviewing court has found claims to be directed to abstract ideas when they recited similar subject matter. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (collecting, organizing, and storing data).

Alternately this is an example of concepts performed in the human mind as mental processes because the steps of transmitting, displaying, and receiving data mimic human thought processes of observation, evaluation, judgment, and opinion, perhaps with paper and pencil, where the data interpretation is perceptible only in the human mind. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016);

*FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093–94 (Fed. Cir. 2016). Claim 21, unlike the claims found non-abstract in prior cases, uses generic computer technology to perform data transmission, display, and reception and does not recite an improvement to a particular computer technology. *See, e.g.*, *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314–15 (Fed. Cir. 2016) (finding claims not abstract because they "focused on a specific asserted improvement in computer animation"). As such, claim 21 recites transmitting, displaying, and receiving data, and not a technological implementation or application of that idea.

From this we conclude that at least to this degree, claim 21 recites managing commercial tipping payments by presenting a way for a media content consumer to make a tip payment, which is a commercial and legal interaction, one of certain methods of organizing human activity identified in the Revised Guidance, and, thus, an abstract idea.

STEP 2A Prong 2

The next issue is whether claim 21 not only recites, but is more precisely directed to this concept itself or whether it is instead directed to some technological implementation or application of, or improvement to, this concept i.e. integrated into a practical application.[7]

> At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. "[A]pplication[s]" of such

[7] *See, e.g.*, *Alice*, 573 U.S. at 223, discussing *Diamond v. Diehr*, 450 U.S. 175 (1981).

> concepts "'to a new and useful end,'" we have said, remain eligible for patent protection.
>
> Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the "'buildin[g] block[s]'" of human ingenuity and those that integrate the building blocks into something more.

*Alice*, 573 U.S. at 217 (citations omitted).

Taking the claim elements separately, the operation performed by the computer at each step of the process is expressed purely in terms of results, devoid of implementation details. Step 3 is a pure data gathering step. Limitations describing the nature of the data do not alter this. Steps 1 and 2 recite basic conventional data operations such as generating, updating, and storing data. Limitations 4 and 5 are not steps per se, but limitation 4 characterizes the interface as computer based and limitation 5 characterizes the timing of displayed content. All limitations recite generic computer processing expressed in terms of results desired by any and all possible means and so present no more than conceptual advice. All purported inventive aspects reside in how the data is interpreted and the results desired, and not in how the process physically enforces such a data interpretation or in how the processing technologically achieves those results.

Viewed as a whole, Appellant's claim 21 simply recites the concept of managing commercial tipping payments by presenting a way for a media content consumer to make a tip payment as performed by a generic computer. This is no more than conceptual advice on the parameters for this concept and the generic computer processes necessary to process those parameters, and do not recite any particular implementation.

Claim 21 does not, for example, purport to improve the functioning of the computer itself. Nor does it effect an improvement in any other

technology or technical field. The 20 pages of written description in the specification do not bulge with disclosure, but only spell out different generic equipment[8] and parameters that might be applied using this concept and the particular steps such conventional processing would entail based on the concept of managing commercial tipping payments by presenting a way for a media content consumer to make a tip payment under different scenarios. They do not describe any particular improvement in the manner a computer functions. Instead, claim 21 at issue amounts to nothing significantly more than an instruction to apply managing commercial tipping payments by presenting a way for a media content consumer to make a tip payment using some unspecified, generic computer. Under our precedents, that is not enough to transform an abstract idea into a patent-eligible invention. *See Alice*, 573 U.S. at 225–26.

None of the limitations reflects an improvement in the functioning of a computer, or an improvement to other technology or technical field, applies or uses a judicial exception to effect a particular treatment or prophylaxis for a disease or medical condition, implements a judicial exception with, or uses a judicial exception in conjunction with, a particular machine or manufacture that is integral to the claim, effects a transformation or reduction of a particular article to a different state or thing, or applies or uses the judicial exception in some other meaningful way beyond generally linking the use of the judicial exception to a particular technological

[8] The Specification describes a television, a computer monitor, any other visual monitor, a smartphone, a tablet, a laptop, a projector, or any other viewing/listening device, platform, or technology known in the art or otherwise available. Spec. para. 30.

environment, such that the claim as a whole is more than a drafting effort designed to monopolize the exception.

We conclude that claim 21 is directed to achieving the result of managing commercial tipping payments by advising one to present a way for a media content consumer to make a tip payment, as distinguished from a technological improvement for achieving or applying that result. This amounts to commercial or legal interactions, which fall within certain methods of organizing human activity that constitute abstract ideas. The claim does not integrate the judicial exception into a practical application.

STEP 2B

The next issue is whether claim 21 provides an inventive concept because the additional elements recited in the claim provide significantly more than the recited judicial exception.

The introduction of a computer into the claims does not generally alter the analysis at *Mayo* step two.

> the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. Stating an abstract idea "while adding the words 'apply it'" is not enough for patent eligibility. Nor is limiting the use of an abstract idea "'to a particular technological environment.'" Stating an abstract idea while adding the words "apply it with a computer" simply combines those two steps, with the same deficient result. Thus, if a patent's recitation of a computer amounts to a mere instruction to "implemen[t]" an abstract idea "on . . . a computer," that addition cannot impart patent eligibility. This conclusion accords with the preemption concern that undergirds our § 101 jurisprudence. Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of "additional featur[e]" that provides any

> "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself."

*Alice*, 573 U.S. at 223–24 (citations omitted).

"[T]he relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea [] on a generic computer." *Alice*, 573 U.S. at 225. They do not.

Taking the claim elements separately, the function performed by the computer at each step of the process is purely conventional. Using a computer for transmitting, displaying, and receiving data amounts to electronic data query and retrieval—one of the most basic functions of a computer. The limitation of the tipping interface being a computer-based interface is not a step, but a recitation of context. All of these computer functions are generic, routine, conventional computer activities that are performed only for their conventional uses. *See Elec. Power Grp. LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). *See also In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) ("Absent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' . . . those functions can be achieved by any general purpose computer without special programming"). None of these activities are used in some unconventional manner nor does any produce some unexpected result. Appellant does not contend it invented any of these activities. In short, each step does no more than require a generic computer to perform generic computer functions. As to the data operated upon, "even if a process of collecting and analyzing information is 'limited to particular content' or a particular 'source,' that limitation does not make the collection

and analysis other than abstract." *SAP America, Inc. v. InvestPic LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018).

Considered as an ordered combination, the computer components of Appellant's claim 21 add nothing that is not already present when the steps are considered separately. The sequence of data transmission-display-reception is equally generic and conventional. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (sequence of receiving, selecting, offering for exchange, display, allowing access, and receiving payment recited an abstraction), *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1378 (Fed. Cir. 2017) (sequence of data retrieval, analysis, modification, generation, display, and transmission), *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) (sequence of processing, routing, controlling, and monitoring). The ordering of the steps is therefore ordinary and conventional.

We conclude that claim 21 does not provide an inventive concept because the additional elements recited in the claim do not provide significantly more than the recited judicial exception.

REMAINING CLAIMS

Claim 21 is representative. The other independent method claims 24 and 29 are substantially similar at least as regards to this analysis. The remaining method claims merely describe process parameters. We conclude that the method claims at issue are directed to a patent-ineligible concept itself, and not to the practical application of that concept.

There are no structural claims. As a corollary, the claims are not directed to any particular machine.

LEGAL CONCLUSION

From these determinations we further determine that the claims do not recite an improvement to the functioning of the computer itself or to any other technology or technical field, a particular machine, a particular transformation, or other meaningful limitations. From this we conclude the claims are directed to the judicial exception of the abstract idea of certain methods of organizing human activity as exemplified by the commercial and legal interaction of managing commercial tipping payments by advising one to present a way for a media content consumer to make a tip payment, without significantly more.

APPELLANT'S ARGUMENTS

As to Appellant's Appeal Brief arguments, we adopt the Examiner's determinations and analysis from Non-Final Action 2–13 and Answer 4–5 and reach similar legal conclusions. We now turn to the Reply Brief.

We are not persuaded by Appellant's argument that the claims recite

> use of a technology platform/interface (remotely consuming media content) that has given rise to a novel way to use technology to elicit and collect tips: using technology to remotely provide a tip for remotely consumed media content, in response to a tipping elicitation/interface provided in conjunction with and as part of the technology interface.

Reply Br. 2.

Novelty is not at issue. "A claim for a new abstract idea is still an abstract idea. The search for a § 101 inventive concept is thus distinct from

demonstrating § 102 novelty." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016).

Managing tipping payments is an administrative problem, not a technological problem. The claims recite a conceptual administrative solution devoid of technological implementation details. Such conceptual functional claiming is generally insufficient to confer eligibility.

> At that level of generality, the claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem. The purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea.

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016).

Further, to the extent Appellant argues the claims produce a useful result, utility is not at issue and is generally insufficient to confer eligibility. "That the automation can 'result in life altering consequences,' is laudable, but it does not render it any less abstract." *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019). "[U]tility is not the test for patent eligibility under the Supreme Court's cases." *In re Smith*, No. 2022-1310, 2022 WL 4112730, at *3 (Fed. Cir. Sept. 9, 2022)(non-precedential)(citing *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 591 (2013)).

*Claims 21–23 rejected under 35 U.S.C. § 103(a) as unpatentable over Lim and Van Vleck*

As to claim 21, we are not persuaded by Appellant's argument that "Examiner provides no justification for combining, instead concluding,

'Therefore it would have been prima facie obvious to one of ordinary skill in the art . . . to combine the teachings of Lim and Van Vleck to provide an improved system and method for displaying media content and an interactive display.'" Appeal Br. 6. Appellant's citation omits the references to Van Vleck that describe this rationale. Examiner goes on to add

> it provides for an improved system and method for displaying media content and an interactive display such that it does not interrupt the media content being delivered to the user, prevent the subscriber from viewing an entire media content segment, and does not prevent the subscriber from viewing subsequent media content. (Van Vleck at Abstract and paras. 2-14).

Ans. 6.

We are not persuaded by Appellant's argument that "Examiner has failed to present any evidence or rationale for predictable success by combining elements from Lim and Van Vleck." Appeal Br. 7. Van Vleck only adds timing parameters to Lim, which are predictably successful on their face.

*Claims 24–27 rejected under 35 U.S.C. § 103(a) as unpatentable over Lim, Twist, and Ignacio*

As to claim 24, reciting three alternative limitations, among which the tipping interface includes elicitation content, we are not persuaded by Appellant's argument that

> [n]either Lim nor Twist discloses that the "tipping interface includes elicitation content" as recited in claim 24. The Examiner relies on Twist for this limitation, but Twist discloses only a naked solicitation or request to donate, and does not disclose a tipping interface that includes elicitation content. Although Twist discloses that the request to donate may be

> customizable, it does not disclose a request that includes elicitation content.

Appeal Br. 7.

The Specification does not define elicitation. The plain meaning of elicitation as a noun is the process of getting information from someone. Twist describes identifying content within the communication that indicates to the recipient a desire to solicit contributions to a charitable organization. The process of getting information from someone begins with a solicitation. Accordingly, Twist's interface includes elicitation content. Appellant's arguments as to examples in the Specification are unpersuasive as we do not import limitations from the Specification into the claims.

> Though understanding the claim language may be aided by explanations contained in the written description, it is important not to import into claim limitations that are not part of the claim. For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

We are not persuaded by Appellant's argument that "the Examiner does not articulate any reasoning for combining Lim's disclosure about media content tipping with Twist's disclosure about using social media to seek donations for charitable causes." Appeal Br. 8. The Examiner determines that the reason is "to provide an integrated online donation option that enables charitable organizations to maximize donations by enabling access to a greater number of potential donors and intelligently suggesting donation quantities and by enabling users to both contribute to a

charitable organization and communicate with others in the process," citing Twist for basis. Non-Final Act. 21.

As to the alternative limitation "the tipping interface includes an upsell interface: or" in claim 24, we are not persuaded by Appellant's arguments that "Ignacio does not disclose an upsell interface for media content tipping, and the Examiner has failed to articulate any reason for combining Ignacio's disclosure of rewards for higher tips for hospital service with Lim's disclosure regarding tipping for media content." Appeal Br. 9. First, this is an alternative limitation to the prior elicitation content limitation, so describing the elicitation content is dispositive. Second, Ignacio describes presenting a customer with rewards (e.g., points) for specifying a generous gratuity level (e.g., 22%) in order to encourage customer to compensate hospitality worker well. This is within the scope of an upsell interface. The Examiner determines the reason to do so is "to maximize the gratuity received from a customer," citing Ignacio. Non-Final Act. 24.

As to claim 26, reciting "the elicitation content comprises a message from an actor, producer, director, or developer of the media content," we are not persuaded by Appellant's argument that "Twist discloses that a social media post may comprise a message portion, a video, and a banner with a 'donate' option. Twist does not disclose an 'actor, producer, director, or developer' in the video." Appeal Br. 9–10. One who acts in a video is an actor. One who produces content is a producer. One who directs how content is put together is a director. The limitation only recites the message is from one of these parties, not how a party actually participates.

*Claim 28 rejected under 35 U.S.C. § 103(a) as unpatentable over Lim, Twist, Ignacio, and Mowry*

As to claim 28 reciting some indication of uses the tips will be put to, we are not persuaded by Appellant's argument that the art fails to describe this. Appeal Br. 10. Appellant acknowledges that Mowry describes such a use, but argues Mowry does not cite a tipping interface. *Id.* But Lim describes the tipping interface. Mowry is evidence that one use of solicitations was the recited financing a sequel. Mowry describes incentives that at least partly involve subsequent or additional media being provided to the user after an initial or related network-based interaction occurs between the user and a site and/or other user.

As to motivation, Examiner determines this was "for incentive-based exchange for project contribution," citing Mowry. Non-Final Act. 25.

*Claims 29–32 rejected under 35 U.S.C. § 103(a) as unpatentable over Lim and Carlson*

We are not persuaded by Appellant's argument that Examiner failed to provide reasoning for combining the art. Appeal Br. 10–11. Examiner determines the reasons would be to provide "an alert that may include a suggested amount for a tip and provides the consumer with information that may be used to determine an amount for the tip," citing Carlson. Non-Final Act. 29.

## CONCLUSIONS OF LAW

The rejection of claims 21–32 under 35 U.S.C. § 101 as directed to a judicial exception without significantly more is proper.

The rejection of claims 21–23 under 35 U.S.C. § 103(a) as unpatentable over Lim and Van Vleck is proper.

The rejection of claims 24–27 under 35 U.S.C. § 103(a) as unpatentable over Lim, Twist, and Ignacio is proper.

The rejection of claim 28 under 35 U.S.C. § 103(a) as unpatentable over Lim, Twist, Ignacio, and Mowry is proper.

The rejection of claims 29–32 under 35 U.S.C. § 103(a) as unpatentable over Lim and Carlson is proper.

## CONCLUSION

The rejection of claims 21–32 is affirmed.

In summary:

| **Claims Rejected** | **35 U.S.C. §** | **Reference(s)/Basis** | **Affirmed** | **Reversed** |
|---|---|---|---|---|
| 21–32 | 101 | Eligibility | 21–32 | |
| 21–23 | 103 | Lim, Van Vleck | 21–23 | |
| 24–27 | 103 | Lim, Twist, Ignacio | 24–27 | |
| 28 | 103 | Lim, Twist, Ignacio, Mowry | 28 | |
| 29–32 | 103 | Lim, Carlson | 29–32 | |
| **Overall Outcome** | | | 21–32 | |

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a). *See* 37 C.F.R. § 1.136(a)(1)(iv) (2011).

AFFIRMED

PTO/AIA/15 (03-13)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number

# UTILITY PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| *Attorney Docket No.* | 12183.205 |
| *First Named Inventor* | Jarom McDonald |
| *Title* | Tipping for Media Content |
| *Express Mail Label No.* | |

## APPLICATION ELEMENTS

*See MPEP chapter 600 concerning utility patent application contents.*

*ADDRESS TO:* **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450**

1. [✓] **Fee Transmittal Form** (PTO/SB/17 or equivalent)
2. [✓] **Applicant asserts small entity status.** See 37 CFR 1.27
3. [ ] **Applicant certifies micro entity status.** See 37 CFR 1.29. Applicant must attach form PTO/SB/15A or B or equivalent.
4. [✓] **Specification** [*Total Pages* 22 ] Both the claims and abstract must start on a new page. *(See MPEP § 608.01(a) for information on the preferred arrangement)*
5. [✓] **Drawing(s)** (35 U.S.C. 113) [*Total Sheets* 6 ]
6. **Inventor's Oath or Declaration** [*Total Pages* 4 ] *(including substitute statements under 37 CFR 1.64 and assignments serving as an oath or declaration under 37 CFR 1.63(e))*
   a. [✓] Newly executed (original or copy)
   b. [ ] A copy from a prior application (37 CFR 1.63(d))
7. [✓] **Application Data Sheet** ** See note below.* See 37 CFR 1.76 (PTO/AIA/14 or equivalent)
8. **CD-ROM or CD-R** in duplicate, large table, or Computer Program (*Appendix*)
   [ ] Landscape Table on CD
9. **Nucleotide and/or Amino Acid Sequence Submission** (*if applicable, items a. – c. are required*)
   a. [ ] Computer Readable Form (CRF)
   b. [ ] Specification Sequence Listing on:
      i. [ ] CD-ROM or CD-R (2 copies); or
      ii. [ ] Paper
   c. [ ] Statements verifying identity of above copies

## ACCOMPANYING APPLICATION PAPERS

10. [ ] **Assignment Papers** (cover sheet & document(s)) Name of Assignee ______
11. [ ] **37 CFR 3.73(c) Statement** (*when there is an assignee*) [ ] **Power of Attorney**
12. [ ] **English Translation Document** (*if applicable*)
13. [ ] **Information Disclosure Statement** (PTO/SB/08 or PTO-1449)
    [ ] Copies of citations attached
14. [ ] **Preliminary Amendment**
15. [ ] **Return Receipt Postcard** (*MPEP § 503*) (*Should be specifically itemized*)
16. [ ] **Certified Copy of Priority Document(s)** (*if foreign priority is claimed*)
17. [ ] **Nonpublication Request** Under 35 U.S.C. 122(b)(2)(B)(i). Applicant must attach form PTO/SB/35 or equivalent.
18. [ ] **Other:** ______

***Note**: (1) Benefit claims under 37 CFR 1.78 and foreign priority claims under 1.55 **must** be included in an Application Data Sheet (ADS).
(2) For applications filed under 35 U.S.C. 111, the application must contain an ADS specifying the applicant if the applicant is an assignee, person to whom the inventor is under an obligation to assign, or person who otherwise shows sufficient proprietary interest in the matter. See 37 CFR 1.46(b).

## 19. CORRESPONDENCE ADDRESS

[✓] The address associated with Customer Number: 000128660 **OR** [ ] Correspondence address below

| | | | | | |
|---|---|---|---|---|---|
| Name | | | | | |
| Address | | | | | |
| City | | State | | Zip Code | |
| Country | | Telephone | | Email | |

| | | | |
|---|---|---|---|
| Signature | /Joseph Shapiro/ | Date | 3-9-2017 |
| Name (Print/Type) | Joseph Shapiro | Registration No. (Attorney/Agent) | 66774 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

**Title of Invention** Tipping for Media Content

As the below named inventor, I hereby declare that:

This declaration is directed to:

- [x] The attached application, or
- [ ] United States application or PCT international application number ______________________

filed on ______________________________.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Jarom McDonald Date (Optional) : 3-9-2017

Signature: /Jarom McDonald/

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| **Title of Invention** | Tipping for Media Content |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

- [x] The attached application, or
- [ ] United States application or PCT international application number ______________________ filed on ______________________________.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Jeffrey Harmon Date (Optional) : 3-9-2017

Signature: /Jeffrey Harmon/

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| **Title of Invention** | Tipping for Media Content |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

- ☒ The attached application, or
- ☐ United States application or PCT international application number ______________________ filed on ______________________.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Neal Harmon Date (Optional) : 3-9-2017

Signature: /Neal Harmon/

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | Tipping for Media Content |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

- ☒ The attached application, or
- ☐ United States application or PCT international application number ______________________ filed on ______________________.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Theron Brent Harmon Date (Optional) : 3-9-2017

Signature: /Theron Brent Harmon/

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# TIPPING FOR MEDIA CONTENT

**Inventors:** Jarom McDonald, Theron Harmon, Jeffrey Harmon, Neal Harmon

## BACKGROUND OF THE INVENTION

**[0001]** The present disclosure relates to a system and method for eliciting, facilitating, providing, and receiving tips for media content.

**[0002]** The notion of tipping is entrenched in some industries and settings, e.g., food service or hotels. At many restaurants, a patron orders food and drink based on prices in a menu. In addition to the menu prices, the patron is expected to tip the server, i.e., give extra money to the server in exchange for the quality of service, or the quality of food, or the restaurant ambiance, or any other features of a restaurant meal or experience.

**[0003]** Similar tipping often occurs in hotels. For example, patrons may provide a tip for room service, or for a valet service, or for assistance in moving their luggage.

**[0004]** Tipping occurs in many other circumstances, often involving a service, e.g., taxi cabs or a coffee shop barista.

**[0005]** These physical services are not, however, the only services for which patrons appreciate and may be willing to, or feel morally obligated to, or even compelled to, provide or otherwise pay a tip for a service or product. For example, a viewer/consumer/patron may be willing to or desirous to pay a tip for media content, e.g. for streaming a movie, filtering a movie, or otherwise providing media content. Although the persons or individuals responsible for providing the media content are generally not physically accessible at the point of consumption of the media content, the consumer of the media content may experience a feeling of gratitude or moral obligation, or may be subject to some other motivation that may incite the consumer to

provide a tip or another "little extra" in response to the media content, or to the manner in which the media content was provided.

**[0006]** For example, a consumer of a streamed movie may be appreciative of the availability of the movie, the technical quality of the streaming, the quality of a user interface, the quality of the content itself, the availability of filtering for the movie, filtering options and effectiveness, pre-configured filters, the cost of streaming and/or filtering, or any other aspect of consuming media content related to the viewing/consumption experience.

**[0007]** Unlike the restaurant, hotel, or taxi cab scenario, in the media content consumption scenario, e.g., watching a streamed movie, the service provider is not physically present to elicit and/or receive tips from the consumer of the media content. What is needed is a solution for eliciting and receiving tips in the context of media consumption, e.g., in the context of streaming a movie.

## BRIEF SUMMARY OF THE INVENTION

**[0008]** A method and system for eliciting and receiving a tip for media content is disclosed.

**[0009]** In one embodiment, a server may stream a movie, television show, or other audiovisual content to a consumer through a consumer's device. A consumer's device may be a computer (including monitor and speakers), a television, a smartphone, a tablet, projector, or any device for playing audiovisual content. The audiovisual content may be streamed over the Internet or other network or communication, or information transfer system as are well known in the art.

**[0010]** The streamed audiovisual content may include a trigger for launching a tipping interface. When a trigger is encountered, the server may present a tipping interface to the consumer of the audiovisual content.

**[0011]** A tipping interface may provide information to the consumer related to tipping, may include elicitation content to motivate or inspire the consumer to tip, and may include controls for the consumer to input a tip amount, a tipping reason, a tipping target, comments, and/or suggestions.

**[0012]** In one embodiment, the tipping interface may include elicitation content such as an audiovisual message from an actor, producer, or another person or group related to the streamed content, or the streaming technology, or filtering technology, or any person or group that may provide information or elicitation related to tipping.

**[0013]** The tipping interface may also include tipping estimate information to guide the user in determining an amount for a tip. Tipping estimate information may include, but is not limited to, information about the user (e.g., demographics, geography), the user's tipping history, tipping information for other consumers, tipping information for the same, similar, or other content, tipping information based on time of day, week, year, and any other information that may assist or guide the consumer in selecting an amount for tip.

**[0014]** The tipping interface may also include one or more controls for selecting a recipient or target for the tip, e.g., a particular actor, or the streaming technology developer or provider, or the music composer, or the filtering technology developer or provider, or a producer, or any other person or entity that associated with the audiovisual content, or streaming the audiovisual content, or filtering the audiovisual content.

**[0015]** The tipping interface may also include one or more controls for indicating or inputting a reason for a tip.

**[0016]** The tipping interface may also include one or more controls for inputting suggestions or comments relating to the audiovisual content, the streaming technology, the filtering technology, or any aspect of consuming the audiovisual content.

**[0017]** The tipping input, i.e., the information that the consumer inputs into the tipping interface is transmitted to the server, which may then effect a financial transaction, based on the tipping input, to consummate a tip.

**[0018]** Additional details, variants, and embodiments are disclosed herein below.

## BRIEF DESCRIPTION OF THE DRAWINGS

**[0019]** Figure 1A illustrates an exemplary streaming interface.

**[0020]** Figure 1B illustrates an exemplary details interface.

**[0021]** Figure 1C illustrates an exemplary tipping interface.

**[0022]** Figure 2 illustrates another tipping interface.

**[0023]** Figure 3 illustrates a flow chart representing one embodiment of the invention disclosed herein.

**[0024]** Figure 4 illustrates an exemplary tipping interface including an upsell interface.

## DETAILED DESCRIPTION OF THE INVENTION

**[0025]** A method and system for eliciting and receiving tips from a consumer based on the consumer's consumption of media content is disclosed.

**[0026]** Media content, as used herein, is broadly construed to include movies, music, sound, audiovisual content, audio content, visual content, haptic content, sensory content, olfactory content, and any other content, or combination of such content, known in the art.

**[0027]** Content consumer, or consumer, or viewer, or patron, as used herein, refers to any individual or group that consumes media content, e.g., by looking, watching, hearing, touching, feeling, smelling or otherwise experiencing media content.

**[0028]** Media content service, as used herein, may refer to an individual, group of individuals, or entity that sells or rents out physical copies of media content, streams media content, filters media content, facilitates consumption of media content, provides performances of media content, or otherwise provides, facilitates, or improves consumption of media content. Media content services may include, but are not limited to, streaming services such as VidAngel®, Google Play®, Amazon®, or any other entity providing or facilitating consumption of media content.

**[0029]** As used herein, interface element is construed broadly to include, but is not limited to a component, element, or control of an interface, or a combination of such. An element may be virtual, physical, or a combination of such. For example, physical interface elements include, but are not limited to, a computer mouse, computer touchpad, a touchscreen, voice controls, foot controls, keyboard, motion sensors, haptic interface technologies, eye movement recognition, joysticks, controllers, and trackballs, and other physical interface elements known in the art. Virtual interface elements include, but are not limited to, HTML and web browsing controls (e.g., buttons, radio buttons, links, drop downs, menu items, and other web browsing controls known in the art), windowing controls, menus, scroll bars, and other virtual interface elements known in the art.

**[0030]** In one embodiment, a consumer may consume, by viewing and listening to, a movie streamed over the Internet by a media content service that is a streaming service, platform, or technology, e.g., VidAngel®, Google Play®, and Amazon®. The consumer may view the

streamed movie on any device known in the art, including but not limited to a television, a computer monitor, any other visual monitor, a smartphone, a tablet, a laptop, a projector, or any other viewing/listening device, platform, or technology known in the art or otherwise available, or any combination of such.

**[0031]** Figure 1A illustrates an exemplary streaming interface 100. Screen 120 may be a smartphone screen, computer screen, television, tablet screen, or any other visual interface or display known in the art. Display portion 110 may display the visual portion of a streamed movie. Controls 112 and 114 may be interface elements for playing/pausing a movie and/or for selecting a time location in a movie, respectively.

**[0032]** Referring to Figure 1B, in one embodiment a streaming service may provide a details interface 150 for displaying, or otherwise communicating to or providing for a consumer, details about a movie. Such details may include, but are not limited to, name, actors, year made, reviews, rating, rating reasons, language, release date(s), and other details known in the art. Exemplary details interface 150 may display movie name 172, principal actors 174, movie year 176, and movie reviews 178. The streaming service may provide details interface 150 via a communications network such as the Internet or any other communication network known in the art, or via any other information transfer technology known in the art.

**[0033]** The details interface may be provided to a consumer in conjunction with streaming a movie. In one embodiment, the details interface may be provided before the movie begins. In another interface, the details interface may be provided as part of the beginning of the movie. In other alternatives, the details interface may be provided during the movie (e.g., via web page, or picture-in-picture, or windowing, or second screen, or secondary device), or after the movie has ended, or as the end of the movie, or during an intermission, or on demand upon

request from a consumer during the movie, or as audio or another alternate content type during the movie, or through an interface distinct from the movie while the movie is playing, or any combination of such, or in any other manner known in the art.

**[0034]** Details interface 150 may include an interface element 180 for launching, initiating, activating, bringing focus to, or otherwise engaging a tipping interface. Interface element 180 may be an interface element such as a button labeled "Tips," or "Tipping," or "Tip." The interface element for initiating the tipping interface may also be shaped or designed to suggest or otherwise reference tipping, or may include an image, icon, or sound, or other interface element or sub-element that references or suggests tipping.

**[0035]** The tipping interface may be any web, HTML, smartphone, browser, application, app, or other interface known in the art. For example, the tipping interface may be a pop-up dialog box, or an element or set of elements within an HTML web page displayed through a browser, or a screen in a smartphone app, or a screen or portion of a screen in a tablet app, or an audio interface, or a haptic interface, or any other interface technology, solution, or platform known in the art.

**[0036]** Figure 1C depicts an exemplary tipping interface 185. In one embodiment, tipping interface 185 may be a tipping interface that is launched when a consumer or user selects interface element 180. Buttons 186, 187, 188, 189, and 190 provide options for a user or consumer to tip in the amount of $1, $2, $5, $10, or a custom amount, respectively. Text boxes 191 and 192 may provide an interface for a user or consumer to enter comments or suggestions respectively.

**[0037]** In another embodiment, a tipping interface may be launched, activated, or initiated automatically during playback or consumption of the media content. For example,

during streaming of a movie, trigger points associated with the movie may be configured to automatically initiate or launch a tipping interface. In one embodiment, a streaming platform may be configured to launch a tipping interface as soon as the closing credits begin, or as soon as the closing credits end, or at a time point during the closing credits (e.g., 10 seconds, or after the first song during the closing credits completes), or at the intermission of a movie, or even during a movie in some circumstances, or at any other time or location during or in a movie or media content. In general, a tipping interface may be launched or initiated at any point during a movie, such as a time point, or before or after particular content, or before or after particular filtering, or in any other manner known in the art.

**[0038]** In media content with a spatial dimension, e.g., three-dimensional ("3D") content or virtual reality or otherwise, a tipping interface may be located at a particular location within the content. For example, if media content comprises a 3D movie, a tipping interface may be initiated or launched at a particular time during playback or consumption of a movie, and may be limited to only a particular location within the presented 3D space. In virtual reality media content, a tipping interface may be located at a particular location, e.g., inside a refrigerator in a kitchen, adjacent to a jewel buried in in a mountain cave, or in any other location or manner known in the art.

**[0039]** The tipping interface may include interface elements for eliciting, selecting, and/or consummating a tip. In some embodiments, the tipping interface may include elicitation content, e.g., one or more highlights from the consumed content, a video, audio, or audiovisual message from the content's creator, producer, actors, developer (e.g., special effects personnel, computer generated graphics personnel, set designer, costume artist, makeup artist, choreographer), promoters, critics, or other interested party which may remind the consumer of

the quality or highlights of the content, or additional information about the content, or other information or communication designed to encourage the consumer to leave or provide a tip, or at least to inform the consumer of the possibility of, opportunity for, and desirability of leaving or providing a tip. For example, if the content is a movie, elicitation content may include a short video in which the movie producer provides additional insights about the movie, thanks the consumer for choosing to watch, and solicits a tip from the user. In another example, elicitation content may include a short video from a person associated with a media content service, e.g., a streaming platform or filtering solution or platform, in which the person explains the importance of reliable streaming and/or good filtering to increase availability of, customizability of, and access to content for families and others.

**[0040]** Figure 2 illustrates exemplary tipping interface 200. Movie playback interface element 210 may be a picture-in-picture format as shown in Figure 2. Elicitation content 230 may be video in which a producer of the movie being played in interface element 210 discusses the movie or otherwise provides content, information, or interesting or inspiring information 235 about the movie that may incite a consumer to provide a tip by selecting one of interface elements 242, 244, 246, 248, or 250.

**[0041]** The interface element(s) for selecting and consummating a tip may include interface elements that a consumer may use to select an amount for a tip, select a means of paying the tip, select a means of obtaining a receipt for paying the tip, input one or more reasons for the tip (e.g., media content, acting, music, storyline, message, availability, filtering, streaming/technology, inspirational value), select one or more particular uses or applications for a tip (e.g., financing a sequel, improving the streaming interface, bonus for owners of streaming service, developers or providers of filtering solution), select one or more a particular recipients

for a tip (e.g., particular actor or performing talent, producer, script writer, music composer, screenwriter), provide a note or communication for inclusion with the tip (e.g., "Thanks for the great movie," "Really appreciate the reliable streaming service," "Really loving the filtering granularity and precision," "Thought the price was fair and reasonable," "First time using your service --- thought the interface was easy to use"), and/or any other interface or information element known in the art that may be associated with or relevant to providing a tip in association with consumption of media content.

**[0042]** In one embodiment, the interface elements for selecting and consummating a tip may include buttons superimposed or overlaid over tip elicitation content, or located beneath tip elicitation content as shown in tipping interface 200. In one embodiment, the tipping interface may include a short video from the producer of a movie, in which the producer speaks and elicits a tip. The tipping interface may include tipping buttons overlaid or superimposed over the video. In one embodiment, the buttons may include multiple buttons respectively labeled "$1 Tip," "$1.50 Tip" "$2 Tip," "$3 Tip," and "Other Amount." Of course, the number of tipping buttons and the amounts associated with the particular tipping buttons may be configured based on tipping estimate information, which may be determined by any number of factors including, but not limited to, the amount the consumer already paid for the media content, information about the user (e.g., frequency of content consumption, tipping history, income, geography, other demographic information), type of content, tipping amounts (e.g., average, median, high, low, other statistics or functions) from others with similar characteristics or for the same or similar content, time of day, day of the week, time of year, or any other factors known in the art which may related to a consumer's willingness to, ability to, and likelihood of providing a tip.

**[0043]** In one embodiment, a tipping button labeled "Other Amount" may be configured to, when selected, provide one or more additional interface elements for inputting a custom amount for a tip.

**[0044]** In one embodiment, a tipping button may be a one-click interface such that a consumer does not have to provide any additional input to consummate a tip after selecting a tipping button. For example, if a consumer is already logged into, or authenticated on a streaming platform, and has already provided billing or payment information to the streaming platform, then the billing platform may immediately consummate the financial transaction underlying a tip when the consumer selects a particular tipping button. For example, if a consumer selects a button labeled "$1.50 Tip," then the streaming platform (or other provider of media content) may immediately initiate a transaction to bill $1.50 to a credit card, bank account, Venmo® account, or other financial account associated with the consumer or the consumer's account with the streaming platform or other provider of media content.

**[0045]** In some embodiments, the streaming platform may require a confirmation, e.g., by clicking through a "confirm" dialog or control before consummating the financial transaction underlying the tip.

**[0046]** In some embodiments, a consumer may be presented with a payment interface when the consumer selects or operates a tipping interface element to make a tip. Such interfaces are well known in the art, and may provide input controls for the user to enter credit card information, or bank account information, or other financial transaction information such as PayPal®, Venmo®, or any of other numerous platforms or systems known in the art for engaging in online financial transactions.

**[0047]** In some embodiments, if the consumer desires to enter a tip in a custom amount, e.g., an amount for which a tipping button is not explicitly provided, an "Other Amount" interface element may be provided for a consumer to enter a custom tip amount, or an interface element for entering an amount may be provided when the consumer selects the "Other Amount" control.

**[0048]** In one embodiment, the tipping interface may provide an interface element that informs as to a consumer's tipping history, tips from other consumers for the same or similar media content for which a user is considering tipping, or average tip amounts for movies, genres of movies, types of content, artists, or any other information that may be useful to a consumer in determining whether to make a tip and the amount of a tip.

**[0049]** In some embodiments, a tipping interface may be presented to a consumer only once per playback or consumption of particular content. As described elsewhere herein, such presentation of a tipping interface could be presented at any time or location during playback or consumption of media content.

**[0050]** In other embodiments, a tipping interface may be presented to a consumer multiple times, or in multiple locations, during or in playback or consumption of media content.

**[0051]** In some embodiments, a tipping interface may be launched, activated, or otherwise presented to a user during playback or consumption of media content upon input or interaction from a user selecting or otherwise eliciting presentation of a tipping interface at any time or location during playback or consumption. For example, the tipping interface may be made available as an interface element superimposed over or embedded in a movie, or as an interface element provided in conjunction with a movie, e.g., on a second screen, or on another screen or monitor, or on a smartphone while a movie is playing on a computer monitor or

television, or in unused screen or display space, or via sound/voice interface, or in any other manner known in the art whereby a user may enter input or interact with an interface element to launch, initiate, activate, or otherwise engage a tipping interface during playback or consumption of media content.

**[0052]** In one embodiment, launching, initiating, activating, or engaging a tipping interface during content playback or consumption may cause a picture-in-picture effect, or a dual screen effect. For example, for a picture-in-picture effect, during playback of a movie, initiation or launch of a tipping interface may cause the content on a display screen to shrink to a small size and be shown "picture-in-picture," i.e., covering a part of the tipping interface. A picture-in-picture effect may also result in the tipping interface being shown in a small (or smaller than the area showing the media content) area that covers part of the media content being played.

**[0053]** A dual window effect is similar, except that instead of the tipping interface covering some or all of the content playback, or the content playback covering some or all of the tipping interface, a dual screen effect may size the content playback and tipping interface so that both are visible, at least in part, on the same display or screen.

**[0054]** In one embodiment, at any time that a tipping interface is visible or otherwise presented to a user, the tipping interface, or an associated interface, includes an interface element that, when selected or operated, closes the tipping interface. In some embodiments, the tipping interface, or an associated interface, may also include an interface element for pausing or minimizing the tipping interface.

**[0055]** In some embodiments, a consumer may pay for content independent of whether or not the consumer chooses to tip through a tipping interface. In other embodiments, a consumer

may consume content without any required payment, i.e., for free, and may be provided an opportunity to tip through a tipping interface.

**[0056]** In one embodiment, a tipping interface may include an upsell interface and/or upsell content. The upsell interface may include one or more interface elements through which a user may select an upsell. For example, the user may select to tip $20, for which the user may receive a personalized social media, e.g., Facebook®, comment or post from an actor or comedian. Or the user may select to tip $5, for which the user may receive a ring tone comprising a notable audio excerpt from the media content for which the user is tipping.

**[0057]** In general, an upsell interface could include interface elements associated with one or more tipping amounts, and may include interface elements to communicate to a user various tipping amounts and associated upsell incentives, or options for upsell incentives.

**[0058]** An upsell interface may also provide one or more interface elements for selecting or inputting a custom tipping amount. When a custom tipping amount is inputted or selected, the tipping interface may display one or more upsell incentives available at an inputted or selected tipping amount. For example, if a user selects or inputs a $3 tipping amount into the upsell interface, then the upsell interface may provide a drop-down interface element with options including a pre-recorded ring-tone, or a music-download, or a discount to an upcoming event.

**[0059]** Upsell incentives may include, but are not limited to (1) a personalized social media post, e.g., on Facebook®, by an actor or comedian associated with the consumed media content, or from another noteworthy individual, personality, or entity; (2) a CD (compact disc); (3) being followed on social media by an actor or comedian associated with the consumed media content, or by another noteworthy individual personality, or entity; (4) a music or media content download; (5) access to online media content; (6) a discount or free access to an event; (7) a

personalized ringtone message from an actor or comedian associated with the consumed media content, or other notable individual, personality, or entity; (8) a pre-recorded ringtone; (9) a ringtone featuring an excerpt from media content associated with the tipping; (10) a product or service or discount on a product or service; (11) additional media content; or any other incentive known in the art.

**[0060]** Figure 4 illustrates an exemplary upsell interface 400. Interface elements 442, 444, 446, 448, and 450 may be selectable by a user for making a tip and thereby obtaining a particular upsell incentive. In one example, no upsell incentive may be associated with a $1 tip selectable via interface element 442. A CD may be associated with tipping $5 by selecting interface element 444. A ringtone may be associated with tipping $10 by selecting interface element 446. A personalized Facebook® post may be associated with tipping $20 by selecting interface element 448. If a user selects interface element 450, tipping interface 400 may be configured to display one or more upsell incentive options associated with one or more tipping amounts or ranges.

**[0061]** In one embodiment, the server may track, store, and/or analyze the tipping results associated with the various tipping interface features, as described herein, that may be presented to a user. The recorded data may include, but is not limited to, particular tipping interface features, user characteristics, content, tipping frequency, and tipping amount. As described herein, tipping features may include, but are not limited to, availability of tipping interface, timing of when tipping interface was presented, frequency of availability of tipping interface, frequency of presentation of tipping interface, mode of presentation of tipping interface (device, screen location, media, sound, visual presentation, elicitation information, elicitation content, length of elicitation content), presented tipping options, presented tipping information (tipping

history for a user, tipping data for other users), tipping estimate information, payment options and means, upsell interface and characteristics thereof, and/or any other tipping interface features or characteristics described herein or known in the art.

**[0062]** The server may perform mathematical, statistical, and/or other analysis of the stored tipping results to optimize the expected value of a particular tipping situation. In general, optimization of a particular tipping situation may comprise maximizing the expected value of the tip that a user may provide through the tipping interface. Although optimization generally focuses on a one-time tipping event, optimization may also be directed toward increasing future tipping events, or increasing tipping events across multiple users, or increasing tipping events across multiple content consumptions. Optimization may also be directed toward any other tipping-related goal or objective.

**[0063]** Based on analysis of previous tipping results, and/or in conjunction with other data such as user demographics or viewing/filtering selections, the server may identify, prepare, and present customized tipping interface to a user based on tipping results, user characteristics, or any other factors disclosed herein.

**[0064]** For example, in one embodiment, the server may randomly present one of two tipping interfaces to users for a particular standup comedy content. A first tipping interface may include elicitation content from the comedian associated with the standup comedy content, but without an upsell interface or elicitation. A second tipping interface may include, in addition to elicitation content from the comedian, an upsell interface. The server may store tipping results comprising the average tip received from users based on whether the first or second tipping interface was presented to a user. Based on analysis of this stored tipping results data, the server

may determine which tipping interface, or which tipping interface characteristics, to present to a user who may subsequently view the same standup comedy content.

**[0065]** As will be recognized by a person of ordinary skill, many variations of statistical or other analysis of tipping results may be employed in many different ways to determine the features of a tipping interface for presentation to a user.

**[0066]** Figure 3 depicts a flow chart 300 for an exemplary process for eliciting and receiving tips in conjunction with providing media content.

**[0067]** At step 310 a media content provider, which for the sake of example may be movie streaming service, streams a movie to a consumer device. In one embodiment, the streaming service may stream, or begin streaming, a movie to a consumer's device upon request or agreement from a consumer, and generally, but not necessarily always, upon payment or commitment to pay from the consumer. In some embodiments, a movie may be streamed for free. In one embodiment, the consumer may select media content for streaming at a particular price, and may initiate streaming by paying that price electronically through financial information stored by the streaming service, or by inputting financial information in response to an elicitation by the streaming service, or through a financial transaction service such as PayPal® or Venmo® or any other financial transaction system known in the art.

**[0068]** As is well-known in the art, any one of, or a combination of, many streaming technologies may be employed for streaming a movie via the Internet or other communication network to a consumer device. In one embodiment, the movie may be streamed via a packet technology whereby a movie is segmented, or divided, into packets, each representing a segment of the streamed movie. In many packetized streaming technologies, a segment may represent seconds or fractions of a second of the movie.

**[0069]** In one embodiment, the movie streaming service may also provide filtering functionality, such as is provided by the VidAngel® streaming and filtering service. In a packetized streaming platform, the streaming/filtering service may implement filtering by omitting and/or modifying one or more packets associated with the content to be filtered.

**[0070]** As described herein above, in one embodiment, the streaming service may automatically present a tipping interface to a consumer device at a predetermined point in a movie, e.g., the beginning of the credits, or the middle of the credits, or the end of the credits. In a packetized streaming platform, the streaming service may implement this by tagging a packet with a marker to indicate that a tipping interface should be presented before or after that packet is sent, or by inserting a dummy packet without movie content that serves merely as an indicator that a tipping interface should be displayed. The streaming service may check each packet before it is transmitted, presented, or otherwise provided to the consumer device to determine whether a tipping interface should be presented to the consumer device. Of course, if the streaming service is filtering by removing or omitting packets, then it must check to be sure that it does not tag a filtered packet for the tipping interface, but instead tags a packet that will not be filtered, e.g., a preceding or succeeding packet.

**[0071]** At step 320, the streaming service identifies or receives a trigger for a tipping interface. In one embodiment, the streaming service may check each packet being transmitted to a consumer device and may identify a packet as being tagged for initiating a tipping interface, or as being a dummy packet configured to indicate that a dummy interface should be initiated.

**[0072]** Marking, tagging, and identifying a packet may be accomplished in many ways which are well known in the art. In one example, a packet may include a header field or binary switch.

**[0073]** Upon determining that a tipping interface should be presented to the consumer's device, at step 330 the streaming system may transmit a tipping interface to the consumer's device, or transmit a code or command to the consumer's device directing the consumer's device to launch, initiate, activate, present, enable, and/or display a tipping interface. For example, the streaming system may transmit code for a web page or Internet browser to present a tipping interface on the consumer's device.

**[0074]** As discussed herein above, Figures 1C and 2 illustrate exemplary tipping interfaces that may be presented via a web browser on a consumer's device, which may be a computer or television display, screen, monitor, or other interface technology or platform known in the art.

**[0075]** Moving now to step 340 in Figure 3, the streaming system may receive tipping input from the consumer's device. Received tipping input may be transmitted from a consumer's device to the streaming system or other entity, server, computer, device, or system configured to receive tipping input from a consumer. The tipping input may be transmitted via Internet or other communications network as is well known in the art. Received tipping input may include some or all of, but is not limited to, the information described herein above. For example, as shown in Figures 1C and 2, a consumer may input, through an input interface in communication with the consumer's device, a tip amount, a reason for the tip, and a comment about the tip. Upon receipt of this tipping input, the streaming system may store the received tipping input temporarily or permanently in a database or other data storage solution known in the art.

**[0076]** Moving now to step 350 in Figure 3, the streaming system may effect a financial transaction associated with the received tipping input. In one embodiment, the streaming system may have stored, or may be configured to retrieve, credit card, banking, or online financial

transaction information associated with the consumer that submitted the tipping input. For example, when a consumer creates an account with a streaming system, or logs in, or determines to request or stream a movie, the consumer may provide information for a credit card to the streaming system and may authorize the streaming system to use such credit card information for all financial transactions in which the consumer engages with the streaming system. The streaming system may store this information and use it to consummate a tipping transaction when tipping input is received from or for a consumer.

**[0077]** Although the examples and embodiments disclosed and described herein focus significantly on streaming a movie via the Internet, the inventions, systems, and methods disclosed herein apply analogously to the other media content, media content services, consumers, consumption technologies, and other variants disclosed herein.

**[0078]** The technology described herein can take the form of an entirely hardware implementation, an entirely software implementation, or implementations containing both hardware and software elements. Components described or characterized as a system may comprise one discrete component, e.g., a server, or may comprise multiple components, e.g., a combination of servers, devices, networking components, software, hardware, and other components known in the art, and configured to communicate with each other and work in conjunction with each other as a system.

CLAIMS

WHAT IS CLAIMED IS:

1. A method, comprising:

providing media content to a consumer;

presenting a tipping interface, related to the media content, to the consumer;

receiving tipping input from the consumer, through the tipping interface, wherein the tipping input includes information associated with a tip.

2. The method of claim 1, further comprising effecting a financial transaction based on the received tipping input.

3. The method of claim 1, wherein the media content is provided to the consumer at no charge.

4. The method of claim 1, wherein the tipping interface includes elicitation content.

5. The method of claim 4, wherein the elicitation content comprises a message from an actor, producer, director, or developer of the media content.

6. The method of claim 1, wherein the tipping input includes at least one reason for the tip.

7. The method of claim 6, wherein the at least one reason for the tip is based on at least one of feature of the media content and/or provision of the content, including streaming, filtering, availability, acting, music, storyline, and inspirational value.

8. The method of claim 1, wherein the tipping input includes a use or recipient for the tip.

9. The method of claim 8, wherein the use is one of financing a sequel for the media content, improving streaming for the media content, improving filtering for the media content, improving distribution of the media content, and improving affordability of the media content.

10. The method of claim 8, wherein the recipient is one of an actor associated with the media content, a script writer associated the media content, a singer or music player associated with the media content, a music composer associated with the media content, a screenwriter associated with the media content, a provider of streaming associated with the media content, and a provider of filtering associated with the media content.

11. The method of claim 1, wherein the tipping input includes at least one comment or suggestion based on at least one of the media content, streaming quality, and filtering quality.

12. The method of claim 1, wherein the tipping interface includes tipping estimate information.

13. The method of claim 12, wherein the tipping estimate information is based at least in part on the consumer's frequency of consuming media content, the consumer's tipping history, the consumer's income, the consumer's geographic location, a characteristic of the media content, tipping data for other consumers for the media content, tipping data for other consumers for content other than the media content, tipping data for other consumers that share at least one common characteristic with the consumer.

14. The method of claim 1, wherein the media content includes closing credits and the tipping interface is presented at the beginning of or during the closing credits.

15. The method of claim 1, wherein the tipping interface is presented at one or more trigger points during the media content.

16. The method of claim 1, wherein the tipping interface includes an upsell interface.

17. The method of claim 1, wherein presenting the tipping interface to the consumer comprises making the tipping interface available for launch at the consumer's discretion during some or all of the media content.

18. The method of claim 1, wherein presenting the tipping interface comprises determining characteristics of the tipping interface based on tipping results.

19. A system, comprising:

a computer server configured to:

provide media content to a consumer;

determine to present a tipping interface, related to the media content, to the consumer;

present the tipping interface to the consumer;

receive tipping input from the consumer, through the tipping interface, wherein the tipping input includes information associated with a tip.

20. The system of claim 19, wherein:

the media content is provided to the consumer at no charge;

the tipping interface includes elicitation content;

the tipping input includes at least one reason for the tip;

the tipping input includes a use or recipient for the tip;

the tipping input includes at least one comment or suggestion based on at least one of the media content, streaming quality, and filtering quality;

the tipping interface includes tipping estimate information; and

the tipping interface is presented at one or more trigger points during the media content.

ABSTRACT

A system and method for eliciting and receiving tips for media content. A server may provide media content to a consumer by streaming a movie to the consumer's device such as a computer, smartphone, tablet, or television. At a trigger point during the movie, the server may present a tipping interface to the consumer. A tipping interface may provide elicitation content and interface controls to accept tipping input. Elicitation content may be media content designed to inspire the consumer to provide a tip. The tipping interface may also provide information for guiding the consumer as to the amount of a tip. Interface controls in the tipping interface may accept tipping input from the consumer, which may include a tip amount, a reason for the tip, and suggestions related to the streamed movie or the streaming or filtering of the streamed movie. The server may receive the tipping input from the consumer and may effect a financial transaction based on the received tipping input.




FIG. 1A

TIPPING FOR MEDIA CONTENT
Inventor(s): Jarom McDonald, Theron Harmon, Jeffrey Harmon, Neal Harmon






FIG. 1B


185
Tips!
$1
$2
$5
$10
Other Amount
186
187
188
189
190
comments:
suggestions:
191
192

FIG. 1C

TIPPING FOR MEDIA CONTENT
Inventor(s): Jarom McDonald, Theron Harmon, Jeffrey Harmon, Neal Harmon






FIG. 2

TIPPING FOR MEDIA CONTENT

Inventor(s): Jarom McDonald, Theron Harmon, Jeffrey Harmon, Neal Harmon

5/6




**FIG. 3**

TIPPING FOR MEDIA CONTENT
Inventor(s): Jarom McDonald, Theron Harmon, Jeffrey Harmon, Neal Harmon






FIG. 4

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
|---|---|---|
| | Application Number | |

| Title of Invention | Tipping for Media Content |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2 (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

**Inventor** 1 Remove

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| Mr. | Jarom | | McDonald | |

**Residence Information (Select One)** ● US Residency ○ Non US Residency ○ Active US Military Service

| City | Spanish Fork | State/Province | UT | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 1381 River Ridge Lane | | |
|---|---|---|---|
| Address 2 | | | |
| City | Spanish Fork | State/Province | UT |
| Postal Code | 84660 | Country | US |

**Inventor** 2 Remove

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| Mr. | Theron | Brent | Harmon | |

**Residence Information (Select One)** ● US Residency ○ Non US Residency ○ Active US Military Service

| City | Lehi | State/Province | UT | Country of Residence | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | 504 East 1000 North | | |
|---|---|---|---|
| Address 2 | | | |
| City | Lehi | State/Province | UT |
| Postal Code | 84043 | Country | US |

**Inventor** 3 Remove

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| Mr. | Jeffrey | | Harmon | |

**Residence Information (Select One)** ● US Residency ○ Non US Residency ○ Active US Military Service

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
|---|---|---|
| | Application Number | |
| Title of Invention | Tipping for Media Content | |

| | | | | | |
|---|---|---|---|---|---|
| **City** | Lehi | **State/Province** | UT | **Country of Residence** | US |

**Mailing Address of Inventor:**

| | | | |
|---|---|---|---|
| **Address 1** | 289 North 100 East | | |
| **Address 2** | | | |
| **City** | Lehi | **State/Province** | UT |
| **Postal Code** | 84043 | **Country** i | US |

**Inventor** 4 Remove

**Legal Name**

| **Prefix** | **Given Name** | **Middle Name** | **Family Name** | **Suffix** |
|---|---|---|---|---|
| Mr. | Neal | | Harmon | |

**Residence Information (Select One)** (●) US Residency ( ) Non US Residency ( ) Active US Military Service

| | | | | | |
|---|---|---|---|---|---|
| **City** | Provo | **State/Province** | UT | **Country of Residence** | US |

**Mailing Address of Inventor:**

| | | | |
|---|---|---|---|
| **Address 1** | 1330 Apple Ave. | | |
| **Address 2** | | | |
| **City** | Provo | **State/Province** | UT |
| **Postal Code** | 84604 | **Country** i | US |

All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button. Add

## Correspondence Information:

**Enter either Customer Number or complete the Correspondence Information section below. For further information see 37 CFR 1.33(a).**

☐ **An Address is being provided for the correspondence Information of this application.**

| | |
|---|---|
| **Customer Number** | 000128660 |
| **Email Address** | jshapiro@strongandhanni.com |

Add Email Remove Email

## Application Information:

| | | | |
|---|---|---|---|
| **Title of the Invention** | Tipping for Media Content | | |
| **Attorney Docket Number** | 12183.205 | **Small Entity Status Claimed** | ☒ |
| **Application Type** | Nonprovisional | | |
| **Subject Matter** | Utility | | |
| **Total Number of Drawing Sheets (if any)** | 6 | **Suggested Figure for Publication (if any)** | 1 |

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| | | |
|---|---|---|
| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
| | Application Number | |
| Title of Invention | Tipping for Media Content | |

## Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

## Publication Information:

☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| | | | |
|---|---|---|---|
| Please Select One: | ● Customer Number | US Patent Practitioner | ◯ Limited Recognition (37 CFR 11.9) |
| Customer Number | 000128660 | | |

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | | | |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button. Add

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| | | |
|---|---|---|
| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
| | Application Number | |
| Title of Invention | Tipping for Media Content | |

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX)[i] the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

Remove

| Application Number | Country[i] | Filing Date (YYYY-MM-DD) | Access Code[i] (if applicable) |
|---|---|---|---|
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button. Add

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
|---|---|---|
| | Application Number | |
| Title of Invention | Tipping for Media Content | |

## Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**: This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐ A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐ B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
|---|---|---|
| | Application Number | |
| Title of Invention | Tipping for Media Content | |

## Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Applicant** 1 Remove

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| Assignee | Legal Representative under 35 U.S.C. 117 | Joint Inventor |
|---|---|---|
| Person to whom the inventor is obligated to assign. | Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here. ☐

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Applicant:**

| | | | |
|---|---|---|---|
| **Address 1** | | | |
| Address 2 | | | |
| **City** | | **State/Province** | |
| **Country** | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Applicant Data may be generated within this form by selecting the Add button. Add

## Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
|---|---|---|
| | Application Number | |
| Title of Invention | Tipping for Media Content | |

**Assignee 1**

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

Remove

If the Assignee or Non-Applicant Assignee is an Organization check here. ☐

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| | | | |
|---|---|---|---|
| **Address 1** | | | |
| Address 2 | | | |
| **City** | | **State/Province** | |
| **Country** i | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button. Add

## Signature:

Remove

**NOTE:** This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the INITIAL filing of the application and either box A or B is not checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic entity** (e.g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| **Signature** | /Joseph Shapiro/ | | | Date (YYYY-MM-DD) | 2017-03-09 |
|---|---|---|---|---|---|
| First Name | Joseph | Last Name | Shapiro | Registration Number | 66774 |

Additional Signature may be generated within this form by selecting the Add button. Add

PTO/AIA/14 (11-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 12183.205 |
|---|---|---|
| | Application Number | |

| Title of Invention | Tipping for Media Content |
|---|---|

This collection of information is required by 37 CFR 1.76. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 23 minutes to complete, including gathering, preparing, and submitting the completed application data sheet form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1 The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3 A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent CooperationTreaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

## CERTIFICATE OF SERVICE AND FILING

I certify that on January 16, 2024, I electronically filed the foregoing using the Court's CM/ECF filing system. All counsel of record who are deemed to have consented to electronic service, including counsel for appellant, were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

*/s/Joseph Shapiro*
Joseph Shapiro
SHAPIRO IP LAW
138 E 12300 S, Unit 334
Draper, UT 84020
jshapiro@shapiro-ip.com
801.921.1136

*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Federal Circuit Rule 35(d) and Fed. R. App. P. 35(b)(2) because:

   this brief contains 4,454 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 35(c)(2).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in proportionally space typeface using Microsoft Word in 14-point Times New Roman.

*/s/Joseph Shapiro*
Joseph Shapiro
SHAPIRO IP LAW
138 E 12300 S, Unit 334
Draper, UT 84020
jshapiro@shapiro-ip.com
801.921.1136

*Counsel for Appellants*